### MARY C. CARRADINE et al. v. JAMES S. CARRADINE.

1. GRANT: RESTRICTIONS INCONSISTENT WITH THE ESTATE GRANTED ARE VOID.— If the import of the previous provisions in a deed be such as to vest an absolute estate in fee, in the first taker, subsequent restrictions inconsistent with such an estate are void.   See 1 Prest. on Est. 365, 366; 2 Blackstone's R. 698; Fearne on Rem. 174.

2. SHELLEY'S CASE: EXECUTED TRUSTS.—Wherever the whole beneficial interest in the estate is vested in the first taker, and a mere naked legal title only remains in the trustee, who is charged with no duty in reference to the estate, except to see that it is not alienated, but preserved for the limitee in the remainder, a freehold estate vests in the first taker within the meaning of the rule in Shelley's case.

3. Trusts: when executed.—A trust is executed, unless the instrument crea‑ ting it contemplates some future act of conveyance by the trustee, and without which the estate would not vest in the cestui que trust. See Fearne on Rem. 143; 2 Jarman on Wills, 253; 4 Kent Com. 304; Prest. on Estates, 388.

4. Shelley's case: executed trust subject to same rules as limitations of legal estates.—Executed trusts are subject to the same rules as limitations of legal estates, and hence are within the operation of the rule in Shelley's case.

5. Same: in force in this state: rule on this subject.—The rule in Shel‑ ley's case, at least so far as personal property is concerned, is in force in this State, and will be applied wherever it expressly or plainly appears, that it was the intention of the grantor or testator, by the use of the words "heirs," "heirs of the body," "issue," &c., to designate a class or denomination of persons to take the inheritance in succession from generation to generation, in their character as heirs of the ancestors. See *Hampton* v. *Rarker*, 30 Miss. R. 205.

6. Same: executed trusts: inconsistent restrictions on estate.—R. con‑ veyed slaves to K. in trust: 1st, to control and manage the same for S. until she arrived at full age, or married; 2d, then to deliver them into her posses‑ sion, and account for the profits which had previously accrued; and 3d, after such delivery that he should see that the slaves were not disposed of, but pre‑ served for the benefit of the heirs of the body of S., in whom, upon her death, they should vest, and if she should die without heirs of her body, that then the slaves should vest in her heirs by the maternal line: Held, 1st, that S. took a freehold estate in the slaves; 2d, upon delivery of possession to her, accord‑ ing to the directions of the deed, the trust became executed; and 3d, that under the operation of the rule in Shelley's case, the whole estate in the slaves vested in her.

7. Estoppel: admissions when they operate as such.—Admissions made in the progress of a suit, as a substitute for proof of any material fact, or by pleading or by setting forth particular facts as ground of complaint or defence, amount in law to estoppels only in that suit and between the parties thereto; and hence, if a party successfully defend a suit for the recovery of personal pro‑ perty upon the ground that the title is in a stranger, he will not be afterwards estopped from denying such stranger's right.

Appeal from the Chancery Court of Yazoo county. Hon. E. G. Henry, chancellor.

This bill was filed by appellee, James S. Carradine, against Mary C. Carradine and her children, and W. S. Grayson, to recover cer‑ tain slaves and their heirs.

It appears from the bill that, in 1833, one T. Rowan, in pursu‑ ance of an antenuptial agreement with his wife, executed a deed of trust to one King, by which he conveyed a large number of slaves

to him, for the benefit of his stepdaughter, Louisa Smith; "in trust that the said King, as trustee for the said Louisa Smith, shall hold said slaves under the care and management, in such manner as he shall deem most conducive to the interest of the said Louisa Smith, until she shall arrive at the age of twenty-one years, or shall marry, and then deliver possession of the said slaves to the said Louisa or her husband, and account for the profits of the same; and in accounting for the profits and controlling and managing said slaves, the said trustee shall, in his discretion, hire out said slaves, or work said slaves under his own management, and account for such profits as shall be reasonable and just; as the object of this deed is to have good care taken of said property, so that the same shall not be abused. And also in trust further, that after the said Louisa Smith shall arrive at the age of twenty-one years, or marry, the said trustee shall see that the said property, and the future increase of said slaves, shall not be sold or disposed of, but shall be preserved for the benefit of the heirs of the body of said Louisa Smith, and shall vest in the heirs of her body, upon her death, in case she shall die leaving heirs of her body; but in the event that the said Louisa shall die without heirs of her body, then the said property and increase shall vest in the legal heirs of the said Louisa by her mother's side, and not in any of her heirs by her father's side."

Afterwards the said Louisa Smith intermarried with Henry F. Carradine, and of this marriage the complainant is the only issue. Upon the marriage of Louisa, the trustee delivered possession of the slaves according to the directions of the deed, and they remained in the possession of said Louisa and her husband, until they respectively died. Some years after the marriage, the said Louisa died, and afterwards, the said Henry F. Carradine intermarried with the defendant Mary C., and by her had issue, who are made defendants in the bill.

Before the marriage of said Mary C., she acquired several slaves under a deed, from one Grayson, and which, upon her marriage, went into the possession of her husband Henry F. Carradine, and before the year 1839.

After his second marriage, the said Henry F. Carradine conveyed

all the slaves embraced in the deed from Rowan and King, and also in the deed from Grayson to Mary C. Carradine, to one Feniday, in payment of a debt which he owed to Ship, Feniday & Co., of which firm Feniday was a partner. Feniday afterwards conveyed the slaves to one Henderson, to secure a debt due by S., F. & Co., to one Benjamin Roach. Henderson afterwards sold the slaves under the said deed, and Roach became the purchaser. After Roach purchased, he instituted an action of replevin in the Circuit Court of Yazoo county, against said Henry F. Carradine, for the recovery of the slaves. Upon the trial, the said Henry F. set up title to the slaves in the complainant, under the deed from Rowan to King, as to the negroes therein embraced, and the judgment was for him. Roach took a bill of exceptions, and proposed immediately thereafter to sue out a writ of error, when a compromise was entered into between the parties. By the compromise, Henry F. Carradine executed his note to Roach for several thousand dollars, and Roach executed a deed, conveying the slaves to the defendant, William S. Grayson, in trust, to hold the same until the notes of Carradine were paid, and " after they shall be paid and extinguished, then in trust for the children of the said Henry F. Carradine, now living, and such others as may be hereafter born to him, and for their sole and separate use, and benefit, and behoof."

In 1854, Henry F. Carradine died intestate, and as yet no administration has been granted on his estate. The slaves conveyed in the deed from Roach to Grayson, since the death of Henry F., remained in possession of his widow, Mary C., who claimed title to them under the said deed from Roach.

The bill insists that the deed from Rowan to King, vested only a life estate in Louisa Smith, his mother, and that complainant is entitled to the slaves in remainder, and that the conveyance and all the subsequent deeds, made by Henry F. to Feniday, are void and vested no title; and that the judgment in replevin, is an adjudication against the title of Roach, which is binding on defendants. The prayer was, that all the property embraced in the deed from Rowan to King, should be delivered to complainant, and the defendants account for hire; or for general relief.

HARVARD LAW SCHOOL LIBRARY

*R. S. Holt*, for appellants.

I. It is insisted, that the deed from Rowan operated to invest Louisa Smith with an equitable fee simple title to the property conveyed, and not to vest in her a life estate, and an estate in remainder in complainant.

1. It is to be observed that the deed vests in the trustee Rowan, the entire legal title. It is conveyed to him and " his heirs forever."

2. It is to be further observed that, subject to the contingent remainder over, which was extinguished when Louisa Smith died, leaving issue, the entire equitable interest and estate in the property, is given to Louisa Smith and " the heirs of her body," she being at that time unmarried, and of course without such heirs. The direction is, that the property "shall be preserved for the benefit of the heirs of the body of said Louisa Smith, and shall vest in the heirs of her body."

This language is in common parlance, and in technical effect, equivalent to a grant to Louisa Smith for life, and at her death to " the heirs of her body."

3. We insist, that a grant or conveyance of the legal title to real estate in the same terms, would create a fee tail in the grantee. Such is clearly the law when the word " heirs," or the phrase " heirs of the body," is a word or phrase of limitation, prescribing the course of descent, and not a word of purchase. 1 Greenl. on Real Property, 75, 76 ; 2 Jarman on Wills, 232, 233 ; 7 S. & M. 799, 804, 805.

The intention that the estate shall go to the lineal, and not to the collateral heirs of the grantee, is the test of an estate tail, and as these authorities show, no technical phraseology is necessary to give expression or effect to this intention.

4. Under the rule in Shelley's case, such word or phrase is a word or phrase of limitation, whenever thus used.

The rule is, that where an estate of freehold is limited to a person, and the same instrument contains a limitation, either mediate or immediate, to his " heirs," or " the heirs of his body," the word heirs is a word of limitation, *i. e.*, the ancestor takes the whole estate comprised in this term. Thus, if the limitation be to the heirs of his body, he takes a fee tail ; if to his heirs general, a fee

simple. 2 Jarman on Wills, 241; 4 Kent, 214, 215; 24 Miss. R. 361; 9 Yerger, 207; 7 S. & M. 805.

And these authorities show, that this is not a mere rule of construction, but of law, prevailing even in opposition to the intention of the grantor. Hence it makes no difference that the first estate is meant to be only an estate for life. Such, it is said, is always the intention. 2 Coke, 117, and note *p*; 1 Brown's Ch. R. 199, 200; 2 Jarman on Wills, 245, 246; 2 Ves. Sr. R. 646; 2 Meigs Tenn. Dig. 933; Preston on Est. 364; 2 U. S. Dig. 196, sect. 9; 2 Jarman on Wills, 245, 246.

The emphatic language of Jarman, in his learned work referred to, is, that it is "a rule of tenure, which is not only independent of, but generally operates to subvert the intention." And this feature in the rule is stated in terms equally emphatic in the other authorities.

And this rule is in force in this State, and constitutes part of its judicial system. And it applies equally to limitations of personal as of real estate. 24 Miss. R. 362, 363, 364, 366. This was a limitation of personal estate, and the pointed language of the court is, that the rule "will be applied whenever it expressly, or as plainly appears from the instrument creating the estate, that it was the intention of the grantor, by the use of the words 'heirs,' 'heirs of the body,' 'issue,' &c., to specify a class or denomination of persons to take the inheritance in succession, from generation to generation, in their character as heirs of the ancestor."

5. We insist that the limitation, in the deed from Rowan, fills fully and precisely, the requirements of the rule as stated and expounded by these authorities, and in this decision or opinion of this court.

1. The estate limited to Louisa Smith, the ancestor of complainant, was a freehold.

2. The estate is granted to the ancestor and heirs, by the same instrument.

3. The estates to the ancestor and heir are of the same quality; both equitable.

The legal estate is vested in the trustee in fee simple absolute. There is no provision for divesting him or his heirs of the legal estate, and vesting it either in the ancestor or heirs.

4. The limitation is in express terms, to the heirs of the body generally, and it can only be construed as referring to them as a "class of persons to take in succession," and "in their character as heirs," and "on account of that relationship to the ancestor."

As Louisa Smith, at the date of the deed, had no heir of her body, there was no one in being who could take under the term "heirs," as *descriptio personarum*, and the only way of giving to the term an operative force, is to construe it as a word of limitation. The fact that there is no one in being, at the date of the grant, to whom the term heir can be applied, has always been held conclusive as to legal import.   6 Coke, 17, Wild's case; 2 Bosan. & Pul. 492; 2 Crabb on Real Property, sect. 978; 10 Met. R. 502.

The deed thus vesting in Louisa Smith an estate tail, or limiting the property in such terms, as in a conveyance of real estate would have created such an estate in her, we insist,

6. That it operated to vest in her an absolute equitable interest, or title, in the personal property conveyed.

This position will scarcely be questioned.   It has been always inflexibly held, that the language which will create an estate tail in a deed or grant of real estate, will create an absolute interest in personal property.   1 Peere Wms. 290; 24 Miss. R. 343; *Hampton* v. *Rattinor*, No. 7125, in this court, not reported.

Several objections to these views and conclusions were, however, urged, and successfully urged, in the Circuit Court; and they will no doubt be equally relied on here, as,

1. That the twenty-sixth section of the Act of 1822, Hutch. Code, 610, for construing contingent limitations, converts the word "heirs," in this and similar instruments, into a word of purchase, and abolishes or restricts the operation of the rule in Shelley's case.

This objection is, we conceive, founded on a total misapprehension of the object and meaning of this section of the statute.

It was manifestly adopted, with reference only to the limitation of contingent remainders, and was designed to affix a definite and uniform meaning, to the terms usually employed in their creation, and the uncertain and undefined signification of which, had long been a fruitful source of litigation.   It says in effect, that if any contingent limitation be made to depend on the contingency of a

party dying without "issue," "heirs," "children," &c., it shall be construed to mean "issue," "children," &c., living at his death, unless a contrary intention clearly appear.  Before the enactment of this law, the question whether in such cases the word heirs, issue, children, &c., referred to persons in being, at the date of the instrument, or at some time between that period and the grantor's death, or the period of his death, or to an indefinite failure of issue or lineal descendants, was involved in infinite perplexity, and filled the courts with suits.  Since its enactment, no such difficulty has existed.  But for the law to say, as this does, that certain language limiting an estate, shall be understood to apply to one person, or class of persons, and not to another, is one thing.  For it to say, that such person or persons should, under the language, when applied to them, take a particular kind of estate in opposition to any other, would be quite another; and this section of the statute does not do it.  It applies the language to a particular person, or class of persons, and leaves the extent and quality of their estate to be determined by the same rules which would have before applied, had the same meaning been, in a given case, attached to the same language by judicial interpretation.  Its office is not to prescribe the nature or extent of the estate to be taken, or to change its incidents, but to aid the courts in determining by whom the estate is to be taken.

But this question can now scarcely be considered an open one in this State, since the several cases in which this court have construed this provision of law.

The question is first alluded to in the case of *Carroll* v. *Renich et al.*, 7 S. & M. 806, which was decided with reference to the law of Tennessee, in which State, according to a decision of her Supreme Court, the rule in Shelley's case was in full force.  The court do not expressly determine the effect of this twenty-sixth section upon that rule, but "intimate an opinion that it has changed" the rule on the subject.  As however the case was controlled by the Tennessee law, and the intimation was of the vaguest character, the authority is of no practical value for complainant.

The question also came before the court in the case of *Powell* v. *Brannon*, before cited, in which the rule was sustained as in full force, and the statute held to operate only to impart certainty, or

fixedness to the meaning of certain phraseology used in creating contingent limitations.

In the case of *Kirby* v. *Calhoun*, 8 S. & M. 462, the only question was as to the validity of a contingent remainder, limited to take effect on the death of the party without heirs of her body, which was under the statute held to mean heirs of her body living at her death, and not an indefinite failure of issue. The limitation was sustained as not too remote, and the policy of the fixed rule of interpretation prescribed by the statute thus fully illustrated. It is true, that some observations of the court, in the opinion delivered, bear upon the question, of whether there was an estate tail created in the first taker. But the single question before the court was the validity of the remainder limited over. And that could as well have been limited on an estate tail, as on an estate in fee simple. 2 Coke, 401, note C; 1 Rand. R. 194; 1 East R. 135; 2 U. S. Dig. 197, sect. 25.

In the case of *Hampton* v. *Rather* (No. 7125, in this court), 1 George, 193, this whole question came up, and the previous decisions are reviewed, and the view of this section of the statute, upon which we have insisted, is fully sustained by the court. Indeed the principle decided in that case, is deemed decisive and conclusive, upon every material question involved in this.

2. It was objected, that the rule in Shelley's case only applied to limitations of legal estates. But the authorities abundantly show, that this position is untenable, and that it embraces executed trust estates, not less than legal ones. Preston on Est. 380, 382; 2 Jarman on Wills, 251, 252, 253; 1 Peere Wms. 131; Ambler, 344; 4 Kent, 218, 219, 220; 3 Greenl. Cruise on Real Prop. 348 to 353; 1 Story's Eq. Jur. § 64 b; 7 S. & M. 805, 806; 24 Miss. R. 362.

3. It was objected, that this was a limitation of an executory trust, and that such specially excluded the operation of the rule. But the legal definition of an executed trust, is found to embrace this one in every particular. A trust is said to be executory, only where the object takes, not immediately under it, but by some other act or conveyance by a third person. 2 Jarman on Wills, 253, 254, et seq.; 4 Kent, 304, 305; Preston on Est. 386; 7 S. & M. 806; 24 Miss. R. 343.

By the terms of the Rowan deed it is plain, that whatever estate

Louisa Smith has under it, she derives directly from it, and not from any subsequent act to be done.

4. It was objected that this was a marriage settlement, and that as such, it constituted an exception to the general rule. The answer is, in the first place, that it is an executed settlement, and as such, governed by the same rule as other executed trusts. 7 S. & M. 806, and authorities cited by the court.

In the next place, the exception exists in the case of executory marriage articles, only out of regard for the issue of the marriage, which the parties are presumed to intend to provide for. And courts, in executing such articles on this ground, require settlements to be made, vesting in the issue of the marriage, an estate by purchase.

But in this case, the provision is not for the issue of the marriage, but for a third party. Thus withdrawing the case in every respect from the operation of this exception.

5. It was next objected, that there could be no estate tail, where there was a limitation over on the failure of issue or heirs. The authorities, however, show the reverse to be the law. 2 Coke, 401, note C; 1 Rand R. 194; 7 S. & M. 798, 799; 24 Miss. R. 343–345; 1 Dallas, 47. Indeed such limitations are found almost universally in deeds or other instruments creating estates tail.

From these views, and this consideration of the opposing arguments, we think it is fully proven, that the deed to Rowan, as trustee, vested in Louisa Smith, an absolute equitable fee simple title in the property conveyed, and that complainant cannot claim it under that deed by purchase, or as a direct grantee; and that our first position is fully sustained.

II. Our second position, that the absolute estate thus shown to have been vested in Louisa Smith passed, by operation of law, to her husband, on their marriage, needs no authority to support it. Such was then unquestionably the legal result of the marriage, as the property passed fully into the possession of the husband.

But however this may be, if our first position be sustained, the property, on her death, would have belonged to her husband, as sole distributee of her estate, and not to complainant.

III. If our first position be correct, then is the third necessarily well taken. Whatever defect may have existed in the title Roach

derived under the trust deed to Feniday, only Henry F. Carradine could have insisted on it, and he, by his settlement and compromise with Roach, forever precluded himself from doing so. Indeed the rights of the beneficiary, under the trust deed from Roach to Grayson, are substantially the same as if they took the property as distributees of the estate of H. F. Carradine.

IV. In the fourth place, we insist that the defendants are not estopped by the judgment in the case of *Roach* v. *Carradine.*

1. That adjudication was waived and superseded by the only parties to it, by the compromise which they made inconsistent with it.

2. To constitute a case of res adjudicata constituting an estoppel, as to the questions determined, it must appear:

(1.) That the parties in the two suits are the same.

(2.) That the point adjudicated and determined is the same.

(3.) The point must have been directly at issue, and not merely involved incidentally in the first suit.

(4.) Its determination must be directly and expressly shown by the record in the first case, and not inferred therefrom argumentatively. 1 Greenl. on Ev. § 523, 524, 528, 534, 535, and authorities cited; 1 Phil. Ev. (Cowen & Hill.) 326, 327; 4 Id. 818, note, 571; 1 Wash. C. C. R. 70.

(5.) The estoppel must be mutual. Id.

3. The adjudication relied on here, to mark an estoppel, is wanting in each of these essentials.

(1.) Complainant was no party to that suit, nor could he have been in any way affected by the judgment in it.

(2.) It does not appear that the point involving the title of complainant was in fact adjudicated in that case. It was raised as one of several grounds of defence. But the record does not show that it was decided at all. Other grounds of defence insisted on, if sustained, were equally fatal to the claim of title of the plaintiff in that suit. The record does not show upon which of several grounds the defence was sustained.

4. This determination of the question is not shown by the record, as required by the rule, but is deduced by argument or inference, as a mere probability, and not as a certainty.

This we think a sufficient answer to the claim insisted on, that

defendants are estopped from showing and maintaining their rights.

V. There having been no administration upon the estate of Henry F. Carradine, we think it clear that complainant cannot, as a distributee, maintain a suit to recover negroes which constitute part of his estate, under well-settled rules on the subject.

A distributee has no title, legal or equitable, to the personal property of the deceased until administration and distribution.   His rights can alone be worked out through the Probate Court.

We therefore conclude that the demurrer to the bill should have been sustained.

*George S. Yerger*, on same side.

The limitations contained in the deed of trust vest an estate for life in Louisa Smith, with a remainder to the heirs of her body. By the operation of the rule in Shelley's case, this vests the whole estate in Carradine, the husband. *Powell* v. *Brandon*, 2 Cushman Rep. 362 ; *Haupton* v. *Rather*, 1 George Rep. 193 ; *Harris* v. *McLauran*, 1 Ib. 533.

The limitation to the heirs of her body describes the whole line of inheritable blood (a class to take by descent), and does not admit of being received in a different sense, except express, clear, and un-equivocal language is used to show that it denotes children.   4 Kent's Com. 228 ; 20 Com. Law Rep. 512 ; *Roe* v. *Bedford*, 4 Maule & Selwyn, 362 ; *Jesson* v. *Wright*, 2 Bligh. Rep. 1 ; *Hampton* v. *Rather*, 1 George, 193 ; *Harris* v. *McLauran*, 1 Ib. 533.

Words superadded, with a power to jointure, will not take a case out of the rule. *Broughton* v. *Langley*, 2 Lord Raymond, 873 ; *King* v. *Melling*, 2 Levintz, 58 ; *Frank* v. *Stovin*, 3 East, 548.

Neither will words, without impeachment for waste, with power to jointure, or for life only, and no longer. *Shaw* v. *Wright*, 3 Bro. Ch. Cases, 130 ; *Jones* v. *Morgan*, 1 Ib. 205 ; *Denn* v. *Pucky*, 5 Term, 299 ; *Robinson* v. *Hicks*, 3 Bro. Par. Cases, 180 ; *Doe* v. *Cooper*, 1 East, 229 ; *Roe* v. *Bedford*, 4 Maule & Selwyn, 362.

So the words "then" and "in that case," immediately following the life estate, &c. *Rundall* v. *Ely*, Fearne on Rem. 158 ; *King* v. *Burchell*, Id. 163, 178, 179.

So a limitation, even "in default of such issue," or in default of such heirs.   2 Leigh's Rep. 173, 1 Serg. & Rawle, 8 ; *Doe* v. *Harris*, 4

Barn. & Cres. 610; *King* v. *Melling*, 2 Levintz, 58; *Doe* v. *Hully*, 8 Term Rep. 5.

So superadded words of "limitation," as to "the heirs of the body," and their heirs. Fearne on Rem. 178; Shelley's case, 1 Coke, 98; *Roe* v. *Grew*, 2 Wilson, 322; *Measure* v. *Gee*, 5 Barn. & Ald. 910.

So even where the limitation is to the heirs of the body, as tenants in common, or in such shares as A. shall appoint, the rule applies. *Doe* v. *Goldsmith*, 7 Taunton Rep. 209; *Doe* v. *Harvey*, 4 Barn. & Cres. 610; *Jesson* v. *Wright*, 2 Bligh. Rep. 1.

In a deed like this, consisting of personal property, the American authorities are equally conclusive with the British. See cases collected, 4 Kent Com. 218; 10 Conn. Rep. 448; 2 Murphy's Rep. 137; 1 Hill Ch. Rep. 37; *Polk and others* v. *Fares*, 10 Yerger, 210. In this case the rule was elaborately investigated in regard to its application to American institutions, &c.

But in this State, the question has been conclusively settled. *Powell* v. *Brandon*, 2 Cushman, 344. The devise was to be in trust for A. for life, and after his death, in trust for his lineal descendants in the remotest posterity. The whole estate was in A., the first taker; heirs of the body, are lineal descendants to the remotest posterity. See pp. 361, 362, 365.

To withdraw a case from the rule, the intention to use the words "heirs of the body" not in their technical sense, must not depend upon inference or presumption, but must be manifested by words which are explicit. Page 365.

The rule in Shelley's case does not apply to executory trusts. But it does apply to executed trusts, the same as it applies to legal estates. *Powell* v. *Brandon*, 2 Cushman, 362.

If the limitations in trust are executed in possession, by the Statute of Uses, they confer the legal estate, and in such cases, they are neither executed nor executory trusts. As a conveyance to A., in trust for B. during his life, and after B.'s death, in trust for the heirs of the body of B., both these limitations would vest the legal estate, because the statute would execute the use to the possession. Saunders on Uses, 97–98.

When therefore we speak of trusts executed or executory, we speak of uses or trusts not executed by uniting possession to the

use under the statute. Hence, an executed trust, is a trust raised by direct conveyance to a trustee, the trusts of which are declared in the same deed, but which do not carry or vest the legal estate by the Statute of Uses. 4 Kent's Com. 219 (or 229) sec. lix.; Fearne on Rem. 139–143; 4 Kent, 305, sec. lxi.; 4 Kent, 316, Library Edition.

The question then is, is the limitation to Louisa Smith, for life, a use or trust, executed in possession, so as to vest the legal estate in her for life; or is it an executed trust, vesting her with the equitable interest, only; and is the limitation to the heirs of her body legal or equitable?

Suppose the deed had been to A. in trust for Louisa Smith for life, and after her death, in trust for the heirs of her body. Both these limitations would have carried the legal estate, by the Statute of Uses, and would, of course, have vested an estate tail; or both would have been equitable, and the same result would follow. *Broughton* v. *Langley*, Fearne on Rem. 159.

If in such case, the donor had added, that Louisa Smith should not sell, or that the trustee should not permit her to sell or alienate, it would have been void, because inconsistent with the limitations. Fearne on Rem. 156, 173, 174.

So if the first limitation had been to A., in trust, to permit and suffer Louisa Smith to take the rents and profits for her life, it would have been precisely the same. She took a life estate executed by the statute. *Broughton* v. *Langley*, Fearne, 159.

But suppose it had been in trust, that the trustee should hold possession, and hire out or use the property himself, and account to Louisa Smith for the profits, as it is in this case, would this be a use executed by the statutes, or would the use and the possession be united, so as to vest the legal estate, or, would it be an executed trust, giving Louisa Smith only an equitable life estate?

We may admit safely, that it would be the latter; that the use and the possession would not be united, so as to give the legal estate. And if this were the whole limitation, then it would be an executed trust, vesting an equitable estate for life in Louisa Smith by implication, and as the limitation to the heirs of her body, would carry the legal estate; inasmuch as the statute, as to this limitation, would unite the possession to the use. The rule in Shelley's case would of course not apply.

But the above is not the whole of the limitation to Louisa Smith, or rather the above limitation is only for a definite and fixed period: the trustee is, by the terms of the deed, only to hold possession, and use it himself, and account for the profits, until Louisa Smith is married, or arrives at age. Then the executor's trust ceases. Then he is to deliver possession to her and her husband.

After that time the legal estate in him is held for the use or in trust for Louisa Smith and her husband. He can no longer hold possession. They are entitled to it. It then becomes a use or trust, executed in possession by the Statute of Uses, and vests the legal estate in her husband from that time.

To illustrate: suppose it had been to the trustee in trust, to retain possession, hire the slaves, or use them, and account for the hire, until Louisa Smith married; and from that time, to hold in trust for her or her husband. Now although until marriage, it was a trust, not executed by the Statute of Uses; yet, from marriage, it was a trust solely for them; a bare, naked trust, and consequently was executed by the statute.

This is the precise case at bar. The legal estate in fee was conveyed to the trustee, to hold in trust for his daughter at her marriage. Or, what is the same thing, he then is directed to deliver up possession to her.

The subsequent limitation to the heirs of her body, is also a limitation of the legal estate; for, although the legal estate is in him, yet he holds as a naked trustee for the heirs of her body, and it is therefore executed by the statute.

Both limitations are therefore legal, and the rule applies. For, as before remarked, the direction to the trustee, not to permit them to sell, is void as a trust or direction, because inconsistent with the legal limitations.

The trust, for Miss Smith, ceased when she married, and possession of the property was to be given to her. The trustee no longer held the legal estate.

The trust, on her marriage, vested beneficially in her, by the terms of the deed, as the law is settled. 4 Kent, 311, note, sect. 61.

The subsequent direction, that she was not to sell, or he was to prevent, was void, as the authorities cited prove.

She had then, after her marriage, a legal estate for her life,

either expressly or by implication. An estate for life by implication, is sufficient for the rule in Shelley's case. Fearne on Rem. 40, 174.

VIII. But if the trust was continued in him, it continued throughout. The fee simple was vested in him. If it did not cease at her marriage, but he was still to hold in trust, then it is manifest he held the legal estate in trust for her life; and, after her death, in trust for the heirs of her body. Both limitations would then be equitable. The direction of the trust, that upon her death the slaves should vest in the heirs of her body, vests only such interest as the deed created, *i. e.*, the equitable interest. It is, in other words, an executed trust. Saunders on Uses, 187; *Broughton* v. *Langley*, is decisive; Fearne on Rem. 159.

The whole case is this: a conveyance or trust is made, to hold and keep possession until Louisa Smith marries, then to deliver possession to her for her life, and after her death to vest in the heirs of her body. But the trustee is not to prevent her to alienate.

The trust is terminated upon her marriage, by delivery of possession, and the estate is in her for life, with remainder to her heirs. The restraint upon alienation, being in such case void, or only indicative that a life estate was intended, cannot prevent the rule from operating.

*Brooke & Smedes*, on same side,

Filed an elaborate argument, in which they cited and commented on the following authorities:

Fearne on Rem. 59; *Coster* v. *Tyler*, 1 Call. R. 165; *Bell* v. *Gillespie*, 5 Rand. 342; *Tate* v. *Talley*, 3 Call. 354; 4 John. Ch. R. 35; *Eldridge* v. *Fisher*, 1 Hen. & Munf. 559; *Hampton* v. *Rather*, 30 Miss. R. 205.

*Yerger & Rucks*, for appellees.

The appellants invoke the "rule in Shelley's case," in their behalf. We think the instrument in this case, steers clear of the rule, and is not affected by it.

The rule in Shelley's case has been clearly, fully, and ably defined in 1 Preston on Estates, 264. The definition there given,

has been sanctioned and approved by this court, in *Powell* v. *Brandon*, 2 Cushm. 361, and *Hampton* v. *Rather*, 1 George R. 203.

Among other, the following circumstances must concur in the instrument:

1. The estate limited to the ancestor must be a freehold.

2. The interest limited must be of the same quality, that is to say, it must be a legal estate to both, or an equitable estate to both; not a legal estate to one, and an equitable estate to the other. *Powell* v. *Brandon*, 2 Cushm. 362.

These two essential circumstances, it is believed, do not concur in the conveyance in controversy.

1. The slaves were conveyed to "Thomas Rowan and his heirs forever, in trust; that he, as trustee for said Louisa Smith, should hold and control them until she arrived at the age of twenty-one years, or married, and then deliver them into the possession of said Louisa and her husband, and account, &c.; and also, in further trust, that after said Louisa Smith shall arrive at the age of twenty-one years, or marry, the said trustee shall see that the said property, and the future increase of said slaves, shall not be sold or disposed of, but shall be preserved for the benefit of the heirs of the body of said Louisa Smith, and shall vest in the heirs of her body upon her death, in case she shall die leaving heirs of her body," &c.

We submit, that by the very terms of this instrument, no estate of freehold, either legal or equitable, in the slaves themselves, was conveyed to Louisa Smith. The whole estate, legal and equitable, was vested in Thomas Rowan, the trustee, during the life of Louisa Smith.

She had a right to the pernancy of the profits, which accrued from their labor, till she was twenty-one years of age, or married. At that period she was entitled to the possession of the slaves themselves, but was restricted "from selling or disposing of them." The trustee being required to "preserve them, for the benefit of the heirs of the body of Louisa Smith." A mere right to the possession and personal use of a slave, during life, without the power of selling or disposing of it, with the legal title in another, having a right of control over it, will not constitute a "freehold" in the slave.

In the case of *Loving* v. *Hunter*, 8 Yerger, 5, the Supreme Court of Tennessee held, that where the "use" of a slave was given to one for life, with a limitation over to her heirs at her death, that the "rule in Shelley's case" did not apply, the mother having no such estate as brought the case within the rule.

The same point was afterwards decided in 10 Humphreys R. 474.

. In the present case, the title to the slave was vested in the trustee, to preserve the property for the heirs of Louisa Smith. No title to the slaves themselves, legal or equitable, was vested in Louisa Smith. She had only a naked right of possession during life, without the power of sale or disposal of them, without any seisin of the slaves themselves, and therefore no "freehold" in them.

2. But if it be conceded, that Louisa Smith took an estate of freehold, still the "rule in Shelley's case" is not applicable to this conveyance, for the reason, that the estate limited to the heirs of her body, is of a different quality from that limited to herself.

By the terms of the deed, the legal title to the slaves vested in Rowan, the trustee, to enable him to perform certain duties and trusts touching them, to wit: First, That he would take possession of them, and hold until the marriage of Louisa Smith, or her arriving at the age of twenty-one years, when he should deliver them, accounting for their profits to Louisa Smith and her husband. Secondly. That he would see that the slaves "were not sold or disposed of by Louisa Smith and her husband, and that they were preserved for the benefit of the heirs of the body of Louisa Smith." Here then it is manifest, that Louisa Smith had only an equitable interest or right in the slaves, the legal title being in the trustee, and placed there to enable him to perform the duties, and exercise the powers, which the deed required of him, and authorized him to perform, during the existence of the life estate. But the deed provided further, that upon the death of Louisa Smith, "the slaves should vest in the heirs of her body, in case she should die leaving heirs of her body; but in the event she died without heirs of her body, then the property and increase shall vest in the legal heirs of Louisa Smith, by her mother's side, and not in any of her heirs by her father's side."

Here then it will be seen, that on the death of the first taker the trust estate terminated; all further control of the trustee over it ceased and determined, his title was ended, and the slaves at once vested in the heirs of the body. The estate limited to the heirs of the body, was therefore a legal estate. The property vested in them, the trust was ended, and the trust estate terminated, the purposes for which the trust estate was created being served.

It will thus be seen, that the quality of the estate limited to Louisa Smith, and that to the " heirs of her body," are different, her estate being purely equitable, while their estate is legal. Hence, according to the definition of the "rule" given by Mr. Preston, it is not applicable to this instrument, both estates not being of the same quality. 4 Kent Com. 229, 239; Fearne on Rem. 51, et seq.

3. But again, the trust in this case is executory, and therefore it does not come within the operation of the " rule," because executory trusts, as a class, are exempted from it. 4 Kent's Com. 229, last ed.; Id. 239.

" The test of an executory trust is, that the trustee has some duty to perform, for the performance of which it is necessary the estate should be considered as abiding in him." 2 Rich. Eq. R. 49–53.

In the present case, the trustee had the estate conveyed to him upon certain trusts named in the conveyance. One of them was, "to see that the property and its future increase was not sold or disposed of" by the party to whom the possession was given for life, but "was preserved for the heirs of her body upon her death." Here then the trustee had a duty to perform touching the property, for the performance of which, the estate must, in contemplation of law, be regarded as abiding in him. The trust was therefore executory, and the case withdrawn from the operation of the rule.

4. But again, this conveyance comes within the provisions of the twenty-fifth section of the Statute of Conveyancing.

The proper and legal import of the words, " heirs of the body," embraces any heirs of the given description, or a class of persons, to take the inheritance from generation to generation, in their character as heirs. They are generally words of limitation, and not of purchase. But this ordinary definition of the words will yield to the intention of the grantor, according to the common law rules; and if that intention be clearly expressed, or if it clearly appear,

that the grantor, by the use of them, intended to use them as words of purchase, and not of limitation, that intention would be allowed to prevail. See *Powell* v. *Brandon*, 24 Miss. R. 343.

The case last cited and that of *Hampton* v. *Rather*, above referred to, have held that the twenty-sixth section changed the rule of construction, applicable to these words, to cases coming within the provisions of that section. The case before us comes clearly within the principles and provisions of that section, and therefore is withdrawn from the operation of the rule in Shelley's case.

In the deed before us it was provided, that if the first taker died "without leaving heirs of her body," the estate should vest in her heirs by her mother's side. In using the words "heirs of the body," it is therefore clear, that the grantor was using them as words of purchase, in the sense of children, and that individuals, and not a class was intended; because the provisions of the twenty-sixth section declare, that in using these words, the grantor meant heirs of the body living at her death, which fixes the period of time when the contingent limitation was to take effect, to the period of the death of the first taker, or ten months thereafter, thus showing, that the words heirs of the body were used in the sense of children, or immediate offspring, and were therefore words of purchase, and not of limitation. The principles contained in the cases of *Powell* v. *Brandon*, and of *Hampton* v. *Rather*, were again recognized by this court in *Jordan* v. *Roach*, in which the court held, that under the provisions of the twenty-sixth section, slaves devised to a woman and her heirs, but if she died without issue, to revert to the right heirs of the donor, would not vest an absolute estate in fee in the first taker under the provisions of the twenty-sixth section above referred to.

5. But again : the questions in this case have been all adjudicated by the Circuit Court of Yazoo county, and a judgment rendered therein, settling the questions in favor of the appellee.

Henry F. Carradine, the husband of Louisa Smith, his first wife, and of the mother of the appellants, his second wife, was sued by Benjamin Roach for these slaves. From the record in that case, it appears that Carradine at one time sold the slaves to Feniday, and Feniday sold to Roach, possession of the property remaining in Carradine. Roach sued Carradine in replevin, who defended the suit

upon the ground that the slaves did not belong to him, but belonged to his son, the present appellee, his child by Louisa Smith. On this plea judgment was rendered against Roach, in the Circuit Court of Yazoo. This judgment was final. Roach never prosecuted a writ of error from it, but made a compromise with Carradine, by which it was agreed, that Henry F. Carradine should execute his notes to Roach for about $3500, with William L. Grayson as his security; and that Grayson, to whom Carradine had given a conveyance of them, should convey his interest in them to Roach, in trust as a security for Carradine's notes, and after their payment, in trust for the children of Carradine then living, or that might afterwards be born..

The court will bear in mind, that the appellants pretend to no claim or title, but such as they derive through their father, Henry. If, then, Henry would be estopped from denying the title of John, those claiming under him, or in privity with him, would also be estopped.

The judgment in the case of *Roach* v. *Carradine*, was rendered at the instance of Carradine, upon his plea that he had no title to the slaves, but that they belonged to his son James. That judgment having been so rendered at his instance, he, and those claiming under him, are estopped by the record from setting up title in him, or through him. 4 Kent Com. 261; 1 N. Hamp. 182.

But again: if appellants claim title from Benjamin Roach, they are estopped from denying the title of appellee; because in the suit of *Roach* v. *Carradine*, that question has been directly adjudicated, and he, and those claiming under him, are bound by that decision, and will not be heard again to litigate that question over. For all these reasons we think the decree of the court below was correct, and should be affirmed.

6. The rule, in Shelley's case, does not apply, if after the words "heirs," "heirs of the body," &c., there are superadded words of limitation, which give a different direction to the course of descents, different from what must take place under the former branch of the conveyance. 1 Preston on Estates, 359.

*Q. D. Gibbs*, for same side.

The chief point raised by the demurrer in this case, is upon the

construction of the deed from Rowan to King. Defendants contend that the estate conveyed is, under the rule in Shelley's case, a fee simple in the first taker, and passed by her marriage to her husband.

Ch. Kent, in 4 Kent's Com. 215, Lect. 59, § 4, adopts Preston's definition of that rule; and states, among other exceptions to the rule, that it does not apply, unless the estate to the ancestor and heir, be of the same quality: that is, both must be legal estates, or both must be equitable estates. The heir, in other words, must take precisely the same estate as the ancestor; and when they did so take, by the policy of the English law, they took by descent and not as purchasers. We contend that this deed raised a trust estate purely, for Louisa Smith, and a contingent remainder in fee, a simple legal estate unincumbered by any trust. What is a trust estate? Hill, in his treatise on Trustees, p. 41, says, "it is where one has the legal estate, and the beneficial interest is in another;" and that is exactly the sort of estate that Louisa Smith took. King is in express terms, constituted a trustee for Louisa Smith. His duties as trustee are very specific. He is specially charged with the appropriation of the profits for the benefit of Louisa Smith, during her maidenhood and minority; and upon her marriage, to deliver the property to her husband, and to see that the property is not sold. This trust to continue during the life of Louisa; at her death (if she leave heirs of her body), then the property to vest in such heir, and if she leave no heir of her body, then to vest in her heirs general, by her mother's side. This question is easily solved by determining the point of time at which this trust estate ceased; and the deed itself, in terms as plain as the language affords, determines this. By the deed, by definite appropriate and technical language, not only the trust estate, but the legal estate in King, is fully ended and determined, utterly annihilated, by the death of Louisa Smith. What duty had King, as trustee, to perform after the death of Louisa Smith? What trust was reposed in him, for the heir of the body? How can they be said to be estates of the "same quality," when the trusts are expressly confined to the first taker, all limited to the duration of her life? In the case of *Powell* v. *Brandon*, there was a continuous trust; after the death of the first taker, the trustees were to hold "in trust" for the "lineal descendants,"

Carradine et al. *v.* Carradine.

&c.   And to make this case at all analogous to the case mentioned, and to bring it within the rule in Shelley's case, the deed to King should have provided, that after the death of Louisa Smith, he should hold it for the benefit of the heirs, and appropriate the profits for their benefit.   The estates otherwise, could not be of the same quality.   It seems to us to be very clear, that upon Louisa Smith's death, King's estate was at an end.   Upon the happening of that event, the property was to vest in the heirs of her body, and in default of such, her heirs generally, by her mother's side : and in either event, of course, King's title was gone.   What is the meaning of this term " vest ?"   It is a technical word ; according to Bouvier's Dictionary, to vest, is " to give an immediate fixed right" (see Fearne on Rem. 2); and when used without words to qualify it, means the taking the whole estate, both title and possession. The word is a term peculiar to the common law, as distinguished from equity.   It is frequently to be met with in Blackstone, Coke, and Cruise, when purely legal estates are spoken of.   But it is not to be found in equity treatises, in the sense contended for by opposing counsel : nowhere is it used to convey the idea of a receipt by the beneficiary of the benefits, held by another in trust.   The complainant, under this deed, took a purely legal estate, free from any trust whatever.   He took, not by any act of King's, not by his permission (for no discretion was left him). · The deed, by its terms, vested unconditionally a legal estate in remainder.   The contingency, upon which complainant was to take, happened, and, *ipso facto*, the estate vested.   It is certainly legal and competent, for the owner of property to incumber it with a trust, and in the same instrument provide (after satisfying the trusts) for its vesting in a third party, or revesting in himself.   It is done in many trust deeds.   Story's Eq. sect. 992, 993 ; 4 Kent, 2d ed. p. 230 ; Cruise on Real Prop. title, Deed, ch. 22, sect. 25, 26, 27, 30.   In sect. 26, referring to the case of *Say & Sale* v. *Jones,* 3 Bro. Par. Ca., he says, " There is no instance where the legal limitation of an estate to the heirs of the body of any person, had been united to the prior limitation of the surplus profits, so as to make such person tenant in tail by construction."   See also *Silvester* v. *Wilson,* 2 Term R. 444; *Ware* v. *Richardson,* 3 Mod. 505; *Venable* v. *Morris,* 7 Term, 342, 438; *Doe* v. *Ironmonger,* 3 East, 533; Preston on Est. 372.

There is another reason why the rule in Shelley's case cannot be properly applied to the construction of this deed, and that is, that words are superadded after creating the estate for the heirs of the body, which show that the grantor meant, by "heirs of the body," children.

It is admitted, as contended for by opposing counsel, that when a grantor uses the words "heirs of the body" to designate who should take after the freehold estate in the ancestor, and the estates are of the same quality, and no other words are used to qualify or explain, and no other intention is expressed than the words "heirs of the body" imply by the common law, it is a rule of property, and not a question of intention. But by the common law (without the aid of our statute), if words be superadded, which show the intention of the grantor to be, that the heir shall not take in his character as heir, that intention, whether the instrument be a deed or a will, will prevail to the exclusion of the principle in Shelley's case. Preston says, in his Treatise on Estates, vol. i, side page 275, "The rule is not so strict as to control the manifest intention, if that intention steers clear of the reason of the rule, or of its literal terms." Page 353, he says, "Whenever superadded words of limitation do, intentionally, give a direction to the course of descent, different from that which must take place under the former branch of the gift, so, often the words heirs, &c., in that branch of the limitation will be words of purchase;" and, on p. 359, he says the rule does not apply, "in those instances in which the word 'heirs' appears by some word or expression in the deed, to be used as analogous to, and of the same import only, as the word son or child." See also pp. 349, 376, 380, and 382 (vol. i).

Now do not the words in that part of this deed which refers to the vesting of the estate, upon the contingency of Louisa Smith's death without "heirs of her body," give a "direction to the course of descent different from what must take place under the former branch of the conveyance?" And does it not very clearly appear by the expression, "heirs of the body," when taken in connection with the subsequent clauses, that the grantor uses the term as analogous to, or of the same import as children; else why provide for a portion of the heirs general, to the exclusion of another portion? If he, by "heirs of the body," meant any person answering that description,

why introduce the after-named clause ?   If he did not mean children, the balance of the deed, after provision for heirs of the body, is nonsense.   See 4 Kent's Com. 221, 229 ; 4 Cruise on Real Prop. 335, § 30 ; 10 Hump. Rep. 474.

Opposing counsel argued the proposition very fully, that this is an executed trust, and being such, the court would not carry out the intent of the grantor.   We have not much to say upon this point. Marriage settlements, or agreements for marriage settlements, have always been withdrawn from the rule in Shelley's case, and the intent of the parties, though imperfectly expressed, has always been enforced and the instruments reformed, if necessary to effect that object.   Preston on Est. 288, 289 ; 4 Burr, 2579 ; *Bagshaw* v. *Spencer*, 2 Atk. 283.

The rule in Shelley's case, we think, cannot apply to trust estates, where there is a power given to a trustee to be performed after title of first taker attaches.   If we are right in any of the foregoing positions, the rule in Shelley's case has no application in the construction of this deed.   Believing that several important pre-requisites are wanting in this case, to bring it within the operation of the rule, we do not think it of much consequence, to determine how far our High Court has gone in recognizing this rule, and have but little to say upon that subject.   The case of *Renick* v. *Carroll*, was upon an instrument executed in Tennessee, and was decided in conformity to Tennessee decisions.   In the next case, *Kirby* v. *Calhoun*, the facts bring it clearly within the rule established in Shelley's case.   The ancestor and "heir of the body" both took legal estates, and the technical words were used without any superadding of words to qualify, yet the court then held with the New York, North Carolina, and Virginia decisions, upon a statute like our twenty-sixth section, that the limitation over came within the bounds of the statute.   The next case, *Powell* v. *Brandon*, expressly reaffirms the case of *Calhoun* v. *Kirby*, and the justice who delivered the opinion, though recognizing the rule in Shelley's case to a limited extent, is evidently greatly influenced in the decision, by the remote and indefinite character of the grant.   We call your attention particularly to what the judge says, as to the effect of the twenty-sixth section of our statute.   The construction there given to the statute, entirely changes the construction given by the common law to this

class of deeds, and does make it a question of intention, and requires, before the rule attaches, that the "make plain his intention" that the heirs should take from generation to generation in their character as heirs, must "manifestly and plainly appear." This is almost, in truth, if not entirely, an abrogation of the rule in Shelley's case, and in this State it is not a rule of property, but a question of intention. If the twenty-sixth section of our statute does not abolish the rule altogether, it at least raises a rule of construction, which presumes against the intent, that the heir shall take by descent. The statute says what the words shall mean, unless a different intent is expressed. The case of *Hampton* v. *Rather*, is but an indorsement of the case of *Powell* v. *Brandon*, and does not overrule the case of *Kirby* v. *Calhoun.*

But if we are wrong in anything we have said, there should be judgment on the demurrer for complainant, because the title of the Rowan negroes has been settled by a court of competent jurisdiction against the grantor of defendants. It is *res adjudicata,* and defendants are estopped from setting up any title under Roach or H. F. Carradine. The policy of the law is repose, and when a court of competent jurisdiction, with the proper parties before it, has pronounced its judgment and settled thereby the title to property in controversy, so long as that judgment is in force, and unreversed, it is conclusive upon all parties and privies. A judgment would certainly be very little valued, if the losing party could at once, after judgment against him, make conveyance of the property adjudged not to be his, and thereby invest a third party with all his rights and privileges, which existed before the judgment, and thus reopen litigation in the hands of another. When would there be an end to litigation, if the courts thus permitted their judgments to be evaded? But it is contended that the parties are not the same. It is not necessary that the parties should be identical. Privies in law and estate are as much bound as parties. The defendants set up Roach's title, who before the judgment, had in him all the estate that the rule in Shelley's case could give him; the defendant in the case was the natural guardian of complainant, and had legally possession of the property, and he, and he alone, could be made defendant. The bill of exceptions and instructions show this very question was before the court and decided; but the

recitals in Roach's deed to Grayson are conclusive as to what was decided. We refer to *Adams* v. *Barnes*, 17 Mass. 365, as almost identical with this case. All parties and privies are bound by an estoppel (Comyn's Dig. Estoppel, B.), and every one who claims under another "by act in law or in the *post*, shall be bound," &c. Coke Lit. 352, b. Recitals in a deed are binding upon all claiming under the deed, whether the party claiming the benefit of the estoppel is a party to the deed or not. *Douglas* v. *Scott*, 5 Hammond's R. 194; *Crane* v. *Morris et al.*, 6 Peters, 598; 4 Peters, 82; 4 Denio, 486; 2 Serg. & Rawle, 381; *Inskeep* v. *Shields*, 4 Harrington, 345.

HANDY, J., delivered the opinion of the court.

The case presented by the complainant's bill is substantially as follows :

In the year 1833, Thomas Rowan, of Franklin county, in this State, executed a deed of gift, conveying to John King, and his heirs, a large number of slaves, upon the following trusts : "That the said King, as trustee for Louisa Smith," the stepdaughter of the donor, "shall hold said slaves under his care and management, in such manner as he shall deem most conducive to the interest of the said Louisa Smith, until she shall arrive at the age of twenty-one years, or shall marry ; and then deliver the possession of said slaves to the said Louisa or her husband, and account for the profits of the same ; and in accounting for the profits, and controlling, and managing said slaves, said trustee shall, in his discretion, hire out said slaves, or work them under his own management, and account for such profits as shall be reasonable and just; as the object of this deed is to have good care taken of said property, so that the same should not be abused. And also in trust further; that after the said Louisa Smith shall arrive at the age of twenty-one years, or marry, the said trustee shall see that the said property, and the future increase of said slaves, shall not be sold or disposed of, but shall be preserved for the benefit of the heirs of the body of said Louisa Smith, and shall vest in the heirs of her body upon her death, in case she shall die leaving heirs of her body ; but in the event, that the said Louisa shall die without leaving heirs of her body, then the said property and increase, shall

vest in the legal heirs of the said Louisa by her mother's side, and not in any of her heirs by her father's side."

Louisa Smith intermarried with Henry F. Carradine, in the year 1838, and of that marriage, the complainant, James S. Carradine, was the only issue; and shortly after the marriage, the trustee delivered over the property, according to the terms of the deed; and subsequently Louisa died, and Henry F. Carradine afterwards intermarried with Mary C. Carradine, of which marriage several children were born; and Henry F. Carradine died, leaving his widow and children, who are the defendants in the bill.

Mary C. Carradine became entitled to several other slaves under a deed in trust from one Grayson, which slaves were delivered to her after her marriage to Henry F. Carradine, and during his life, and before the year 1839.

Henry F. Carradine conveyed all these slaves, as well those embraced in the deed of Rowan as those last referred to, to one Ferriday, who conveyed them to one Roach, who conveyed them to a trustee, first to pay certain specified debts, and ultimately to the use of the children of H. F. Carradine; and Mary C. Carradine, the widow, has possession of the greater part of the slaves, claiming title under that conveyance.

The bill avers, that no title passed by the conveyance of Roach, because prior thereto a judgment had been rendered against him, in an action of replevin for the slaves, brought by him against Henry F. Carradine; which is relied upon as *res adjudicata* against his title.

The object of the bill is to obtain a decree in behalf of the complainant, for the slaves embraced in the deed of Rowan, and for their hire; but if unsuccessful in this, it seeks a recovery of his interest in the entire slaves, as one of the children of H. F. Carradine, under the trust deed made by Roach.

The defendants filed a demurrer to the bill, which was overruled, and from that order this appeal was taken.

The first and most important question to be determined is, what estate in the property did Louisa Smith take under the deed of gift, upon the property being delivered to her after her marriage?

It is insisted in behalf of the appellants, that the life estate conveyed to her use, became vested when the property was delivered

to her; and under the limitations of the deed, that she took the title absolutely, divested of the subsequent limitations contained in the deed, by operation of the rule in Shelley's case; and therefore, it being personal property, that the absolute title vested in her husband. Consequently, that the limitation to the "heirs of her body," under which the complainant claims, is inoperative and void.

On the contrary, it is insisted that the rule in Shelley's case has no application to this deed; and in support of that position, several grounds are taken, which involve the merits of the case upon the main point of controversy, and which we will proceed to consider.

1. The first objection to the application of the rule is, that the estate limited to Louisa Smith, by the deed, is not one of freehold, or what would be equivalent to an estate of freehold in real estate; that she was entitled only to the profits of the slaves before marriage, or attaining to the age of twenty-one years, and thereafter she was entitled to the possession, but under the restriction against disposing of them, the trustee, who was invested with the complete legal title, being required to preserve them for the benefit of the heirs of her body, &c.

In determining the legal import of the limitations of the deed, we must ascertain what was the intention of the donor, according to the settled rules of law applicable to such cases, and give effect to the limitations agreeably to such rules. Let us look then at the terms of the instrument.

The first feature in it is, that it vests the legal title in fee in the trustee, subject to the following trusts: 1. To hold the slaves under his care and management until Louisa should become of age, or marry, in the manner deemed by him most conducive to her interest. 2. Then to deliver them into her possession, and account for their hire or profits previously accrued. 3. That the trustee, after such delivery, should see that the slaves were not disposed of, but that they should be preserved for the benefit of the heirs of the body of Louisa, and should vest in the heirs of her body upon her death, in case she should die leaving heirs of her body; but if she should die without leaving heirs of her body, then they should vest in her legal heirs by her mother's side, &c.

It is contended in behalf of the appellees, that the legal estate

did not vest in Louisa upon the delivery of possession to her after her marriage, because she was expressly debarred of the power of disposing of them, and the trustee was required to see that they were preserved for the heirs of her body, &c.

But it is well settled, that if the import of the previous limitations, be such as to vest the absolute estate in the first taker, subsequent restrictions, inconsistent with such an estate, would be void. Thus it is settled that a limitation to the first taker for his life and no longer; or only for life; or for his life and no longer, and that it shall not be in his power to sell, dispose of, or make way with any part of the premises, and the like, will not prevent the operation of the rule. 1 Preston on Est. 365, 366; *Hayes* v. *Foorde*, 2 Wm. Blacks. Rep. 698; Fearne on Rem. 174. Mr. Jarman says, "Words, however positive and unequivocal, expressly negativing the ancestor's estate beyond the period of its primary express limitation, will not exclude the rule; for this intention is as clearly indicated by the mere limitation of a life estate, as it can be by any additional expressions; and the doctrine, let it be remembered, is a rule of tenure, which is not only independent of, but generally operates to subvert, the intention." 2 Jarman on Wills, 246.

The expressions requiring the trustee to see that the slaves were preserved, so far as they affect the freehold character of the estate limited to Louisa Smith, cannot have greater force than the words restraining her power of disposition; and we think it clear, that they cannot be understood to impair or defeat the estate already limited to her, if, apart from these expressions, she had a legal estate of freehold in the property.

2. And this brings us to the second reason relied upon to show that the rule cannot apply, which is, that the two estates are of different qualities, that of Louisa Smith being equitable, and the remainder being legal. It is insisted that the legal estate was in the trustee, who, by the terms of the deed, held it during the life estate of Louisa Smith, and was required to preserve it for those in remainder, to vest in them upon her death; and hence that the trust was executory, and not embraced within the rule in Shelley's case.

It is true that before the marriage, the legal estate was held by the trustee for Louisa Smith. But after her marriage, her right

of possession vested by mere operation of the deed, and the legal title in him was held for her use, or in trust for her. This use or trust was executed in possession, by operation of the Statute of Uses; and upon delivery of possession, the legal estate became vested in her or her husband. The trustee had no further power over the property. He was not required to make any conveyance to her, nor authorized to take any further control of the property. Her title was derived from the deed of gift; and if the subsequent limitations had been valid, upon the determination of her life estate, the property would have vested in the parties in remainder, in virtue of the deed, no act on his part being required or authorized. Nor was he clothed with any legal power over the property, by the expression, that he should see that the property should not be sold or disposed of, and that it should be preserved for the benefit of the heirs of the body of Louisa Smith. His power over the slaves was exhausted by the delivery of possession upon her marriage, and nothing further was necessary to vest the rights intended to be conveyed. He had no power to resume possession of the property for any purpose, nor to interfere with the control of it. Such power cannot be derived by implication; for it must be presumed, that if any active power over the property had been intended to be continued in him, the deed would have provided that he should retain the title until the determination of Louisa Smith's estate, and if she died without issue, that he should then convey it according to the declarations of the deed. Nor was it necessary; for if the limitations in the deed were all valid, the parties in remainder had the power to prevent the alienation by the tenant for life. These expressions, therefore, amount to nothing more in legal effect, than a restriction upon alienation, or a desire that the property should not be disposed of, which we have above seen, cannot prevail against the estate vested by the previous limitations of the deed.

This view of the subject is amply sustained by the authorities. In *Broughton* v. *Langley*, 2 L. Raymond, 873, lands were devised to trustees in fee, and the trustees and their heirs were to stand seised to the intent and purpose of permitting A. to receive and take the rents and profits for and during the time of his life, and after his death, to stand seised to the use of the heirs of the body of A. with remainder over; with a proviso, that the trustees and

A. might make a jointure to his wife; and the question being whether A. had an estate tail executed, or not, it was held that he had; and Lord Holt said, that this would have been a plain trust at common law, and what at common law was a trust of a freehold or an inheritance, is executed by the statute.

This is a much stronger case in favor of the continuance of the trust in the hands of the trustees, than the present case; and Mr. Fearne remarks upon it, "that the circumstances attending the power (to make a jointure), seemed to be very strong against an estate tail; that power being made to depend upon the consent and concurrence of the trustees; and they being required to join in executing it, and of course in the conveyance for that purpose; which seems to have been an evidence of the testator's intention, that the estate should remain in them; and consequently, that he did not intend that A. should take any legal estate at all, much less an estate tail. But however, the strength of the general rule prevailed against these arguments of intention." Fearne on Rem. 159. And it is the settled doctrine that limitations of trusts which are executed, are subject to the same rules as limitations of legal estates. Preston on Est. 382; Fearne on Rem. 157.

Was the trust, then, in this case executory, after the delivery of possession to Louisa Smith and her husband?

Mr. Fearne thus defines executed and executory trusts, drawing the distinction between them which, he says, has run through the several cases affording subject-matter for its application; executed trusts being "when the trusts are directly and wholly declared by the testator, or to attach immediately on the lands under the will itself;" and executory trusts being, " those which are only directory or prescribe the intended limitations of some future conveyance or settlement, directed by the will to be made for effectuating them." Fearne on Rem. 143. Mr. Jarman says, " A trust is said to be executory or directory, when the objects take not immediately under it, but by means of some further act to be done by a third person, usually him in whom the legal estate is vested." 2 Jarman on Wills, 253. Chancellor Kent says, " A trust is executory when it is to be perfected, at a future period, by a conveyance or settlement, as in case of a conveyance to B., in trust to convey to C. It is executed, either when the legal estate passes, as in a conveyance to B. in

trust, or for the use of C., or, when only the equitable title passes, as in the case of a conveyance to B., to the use of C., in trust for D." 4 Kent's Com. 304, 305. Mr. Preston says, " The conclusion that a trust is executed or executory, must depend upon the *quo animo*, on the inquiry, whether another instrument be in the contemplation of the party, as the act which is to give full and complete effect to the principal object he has in view." Preston on Est. 388.

All these definitions, and the cases in which the nature of the two kinds of trusts has been involved, and the distinctions between them settled, clearly recognize the rule that a trust is not executory, unless the instrument creating it contemplates some future act of conveyance by the trustee, and without which the estate would not vest in the cestui que trust. And tested by this rule, it is clear that the trust in behalf of H. F. Carradine and wife was executed and not executory, after delivery of possession of the slaves to them; and their estate became vested in possession, without any power of control by the trustee. Nor was any act necessary or required to be done by him with reference to the estate attempted to be limited to the parties in remainder; for if that estate had been valid in law, it would have taken effect in possession immediately after the determination of the particular estate of Carradine and wife, without any act on the part of the trustees.

Several authorities are relied on in behalf of the appellee to show that the legal title continued in the trustees after the delivery of possession to Carradine and wife; but the nature and circumstances of the trusts to which they apply, are quite different from that in this case.

The cases cited from Fearne, 52 and 210, are cases of devises of real estate to trustees and their heirs, in trust, to permit certain parties to receive the rents and profits, or that the trustees should pay over the rents and profits to them, during their lives, with remainder to heirs in tail. It was held that the legal estate was in the trustees, and that the parties entitled to the rents and profits for life to be paid by the trustees, had only an equitable estate, the pernancy of the rents and profits.

In *Shapland* v. *Smith*, Brown's Ch. Cases, 75, the testator devised lands to trustees in trust, yearly, after paying taxes, repairs,

and expenses, to pay the surplus to his brother for life, and after his decease, to the heirs of his body.   It was held that the trustees, having to pay taxes, &c., had an interest in the premises, and retained the legal estate for the life of the brother.

Upon the same principle, in the case of *Silvester* v. *Wilson*, 2 Durnf. & East, 444, a devise to trustees in trust to receive the rents and profits during the life of A., and to apply them to the maintenance of A. during his life, remainder to the heirs of the body of A., was not a use executed to A., because the purposes of the trust could not be performed unless the trustees received the rents and profits during the life of A., the trust being special and personal, and hence that the legal estate continued in the trustees during his life.

The case of *Porter* v. *Doby*, 2 Richardson Eq. Rep. 49, much relied on in behalf of the appellees, is similar to that of *Silvester* v. *Wilson*, and was decided upon the same reason.   The trust was to take possession of slaves, and apply the proceeds to the maintenance of the testator's daughter and son, during their lives, and after the son's death, to his heirs ; and if the daughter survived the son, the trustee was to keep in his hands a sufficiency for her comfortable support for life, the residue to the heirs of the son.   The daughter survived, and it was held that the trust was not executed during the son's life, and that the trustee retained the legal title during the daughter's life.

All these cases, and others of a like character, are resolvable upon the principle, either that the legal estate was vested in the trustees, and that the object of the trust did not require that the entire legal estate should be divested out of the trustee in order to the enjoyment of the benefits intended to be granted to the cestui que trust; as in cases of real estate, where the trustee under the limitations of the deed stands seised to the use of the parties beneficially interested, according to the nature of their estates, or that it was necessary for the execution of the trusts that the trustee should retain the legal title and the control of the property.   But they do not support the legal title of the trustee in this case, where the terms of the deed did not continue his estate, after delivery of possession to Carradine and wife, and where the purposes of the trust did not render it necessary that he should have possession or control of the property.

And consequently, we are of opinion that the legal estate was vested in Carradine and wife upon the delivery of possession, and that it was the same quality as the subsequent estate limited upon it, and that the objection to the operation of the rule in Shelley's case, on this ground, is untenable.

Again: it is contended, in behalf of the appellees, that the rule in Shelley's case cannot control the limitations of this deed, because the rule is modified by the twenty-sixth section of the Act of 1822, Hutch. Code, 610; and in virtue of the provisions of that statute, the limitation to the heirs of the body, in this deed, creates an estate of purchase, and not one by limitation.

It is held in *Hampton* v. *Rather*, 30 Miss. 205, that this section of the statute was designed simply to lay down a certain intelligible and uniform rule of construction, by affixing to certain words used in deeds and wills a definite and fixed signification, different from that which had been theretofore attached to the same words by the court. And it is also distinctly stated, that the rule in Shelley's case, at least so far as personal property is concerned, has not been abolished, but still exists here, and will be applied whenever it expressly or plainly appears from the instrument creating the estate, that it was the intention of the grantor, by the use of the words "heirs," "heirs of the body," "issue," &c., to specify a class or denomination of persons to take the inheritance in succession, from generation to generation, in their character as heirs of the ancestor.

We do not doubt, therefore, that the limitations of this deed are within the operation of the rule, and that this statute does not affect their import.

The next question to be considered is the effect of the suit of Roach against Henry F. Carradine, for the slaves in controversy, and the judgment thereon in favor of Carradine. It is insisted, in behalf of the appellee, that that judgment is but an adjudication against the title of Roach, under whom the appellants immediately claim, which is binding upon Roach and those claiming under him, and is conclusive against his and their title; and 2d. That Carradine was estopped from setting up title in himself to the slaves, having admitted, in his defence of that suit, that the title was in his son, the appellee, and made defence to the suit on that ground; and that this estoppel concludes the appellants who derive title through him.

1. As to the force of the adjudication, it appears that, although the judgment was rendered in the Circuit Court against Roach, yet he was about to prosecute his writ of error to have the judgment reversed in this court; and in order to avoid further litigation, that Carradine agreed that the title of the slaves was in Roach, by virtue of the deed made by Carradine under which Roach claimed; and that the litigation was compromised by Roach executing the trust deed, under which the children of Carradine are to be entitled to the property, after the payment of certain debts to which it was held bound. Whatever then may have been the effect of the judgment against Roach in the Circuit Court, it is evident that the litigation was not ended, and that the compromise which resulted in the admission of Roach's title, should be considered as having been made pending the litigation, and that the title thereby acquired by Roach is as valid as if acquired during the pendency of a writ of error to the judgment against him.

But if this judgment is to be considered as an adjudication of the title against Roach, it is fatal to the claim of the appellee under the deed from Rowan; for in order to be available to the appellee, by way of estoppel, it must be mutual; and if so, it would be conclusive that the title to the property was in Henry F. Carradine.

2. Admissions made in the progress of a suit, as a substitute for proof of any material fact, or by pleading, and setting forth particular facts as grounds of complaint or of defence, amount in law to estoppels; but they are only so as to the parties to the suit, and in the same suit in which they are made. It would be contrary to all principle to hold a party absolutely concluded by allegations which he had seen fit to make, or by grounds of defence which he thought fit to set up, in one suit, when he was afterwards sued by another party in an action involving the same matter. Such allegations or admissions are made with reference to the particular suit, and cannot operate as estoppels beyond it; because as to strangers to it, there is no privity or mutuality; and as their rights are wholly unaffected by such allegations, admissions, or defences, so must his rights, as against them, not be concluded thereby. It is a common thing for parties sued for the recovery of property, to plead property in a stranger, and rely upon that as a defence, and successfully; but it was never heard of, that the stranger brought

his action against the defendant founded on that evidence alone, and the defendant was held to be estopped by it. Even a judgment rendered upon the question of property, is not binding either in favor of the rights of strangers or against them, except in proceedings *in rem;* much less are the mere incidental admissions or grounds of defence. Greenl. on Evid. §§ 27, 171, 524, 528.

It only remains to consider the last ground of relief set up in the bill. In the event, that the complainant's claim under the deed of gift should not be sustained, the bill seeks a division of the slaves, and the recovery of his share as a distributee of his father, who died intestate, and no administration has been taken upon his estate.

But it is manifest that he is not entitled to this relief under the allegations of the bill, and the exhibits to it.

As to the interest of Henry F. Carradine in the property, that was disposed of by the deed through which Roach claims, which was afterwards consummated by his recognition of Roach's title, in accepting the deed made by Roach for the benefit ultimately of Carradine's children; and he had no estate in the property which could be the subject of distribution to his children, as his property.

With respect to the benefit of the property to which the appellee may be entitled under the trust deed made by Roach, and as one of the children of Carradine, the bill does not show that the trust is in a condition to entitle him to claim a division of the property as one of the beneficiaries under the deed of trust. The bill does not show that the promissory notes mentioned in the deed, and required to be paid before the property should be applied to the use of the children of Carradine, have been paid; and without such showing, it is plain that the complainant was not entitled to any relief in this aspect of the case.

It follows, from the foregoing views of the case, that the court erred in overruling the demurrer; and the decree must therefore be reversed, and the bill dismissed, but without prejudice.